Douglas J. MICHELSON, Plaintiff,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Nelson Bunker Hunt, William Herbert Hunt, Douglas Herbert Hunt, Lamar Hunt, International Metals Investment Company, Ltd., John J. Conheeney, Conti-Commodity Services Inc., Conti-Capital Management, Inc., Conti-Capital Ltd., Norton Waltuch, Gilian Financial, ACLI International Commodity Services, Inc., Bache Halsey Stuart Shield, Inc., Shiek Mohammed Aboud Al Amoudi, Shiek Ali Bin Mussalem, Mahmoud Fustok, Prince Faisal Bin Abdullah, Naji Robert Nahas, Banque Populaire Suisse, Advicorp Advisory and Financial Corporation S.A., Placid Oil Company, Commodity Exchange Inc., The Chicago Board of Trade, Irwin N. Smith, John Does Number Two to Ten, Defendants.

No. 83 Civ. 8898(MEL).

United States District Court, S.D. New York.

Sept. 2, 1987.

Douglas J. Michelson, Albuquerque, N.M., pro se.

Rogers & Wells, New York City, for defendants Merrill Lynch, Pierce, Fenner & Smith, Inc., ACLI Intern. Commodity Services Inc., and John J. Conheeney; William R. Glendon, Guy C. Quinlan, Susan A. Garcia, Peter L. Thoren, of counsel.

Shank, Irwin, Conant & Williamson, Dallas, Tex., for defendants Nelson Bunker Hunt, William Herbert Hunt, Douglas Herbert Hunt, Lamar Hunt and Placid Oil Co.; Roger Goldberg, Robert E. Wolin, of counsel.

Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Washington, D.C., for defendant Intern. Metals Investment Co., Ltd.; Robert Wintrol, Robert Pokusa, of counsel.

Sullivan & Cromwell, New York City, for defendant Prudential-Bache Securities, Inc. (formerly known as Bache Halsey Stuart Shields, Inc.); Richard H. Klapper, of counsel.

Townley & Updike, New York City, James K. Leader, Gary M. Gertzog, of counsel, and Kirkland & Ellis, Chicago, Ill., John E. Angle, Garrett B. Johnson, T. Webster Brenner, of counsel, for defendant Board of Trade of the City of Chicago.

Baer Marks & Upham, New York City, for defendant Commodity Exchange, Inc.; Barry J. Mandel, Thomas E. Albright, Kristine M. Reddington, of counsel.

Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendant Norton Waltuch; Steven J. Glassman, Menachem Z. Rosensaft, Michael A. O'Connor, of counsel.

LASKER, District Judge.

Douglas J. Michelson, who appears *pro se*, is suing a number of individual investors, commodities traders, investment companies, commodities brokers, and two commodity exchanges on various federal and state causes of action for losses he suffered in January 1980 when his metal futures account was liquidated by his broker, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"). Michelson claims that his losses resulted from both the wrongful conduct of Merrill Lynch individually and a conspiracy among all the defendants in 1979–80 to manipulate the price of silver and silver futures in an effort to corner the silver market.

The procedural history of the case is recounted in detail in a previous opinion,

see *Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 619 F.Supp. 727 (S.D.N.Y.1985), and will not be repeated in detail. It suffices here to state that the case began as a lawsuit by Merrill Lynch against Michelson in the United States District Court for the District of New Mexico to recover a deficit balance in Michelson's trading account following its January 10, 1980 liquidation; that in his answer Michelson asserted sixteen counterclaims grounded in state and federal law; that in a series of decisions issued in 1982–83, the judge in the New Mexico proceeding dismissed with prejudice eleven of the counterclaims and granted Merrill Lynch summary judgment on its pleading; that Michelson filed the complaint at issue in this case, asserting thirty-six causes of action against twenty-four named defendants, on July 8, 1983, also in federal district court in New Mexico; that the complaint in the second proceeding was dismissed as to six of the defendants for lack of personal jurisdiction and the case transferred to the Southern District of New York in December 1983; and that disputes between the parties concerning the adequacy of service of process on some defendants delayed proceedings until the spring of 1985, when a number of defendants filed motions to dismiss the complaint. *Michelson*, 619 F.Supp. at 730–32.

The complaint as it stood at the time the motions to dismiss were filed alleged violations of various provisions of the federal antitrust, commodities, and racketeering laws as well as violations of New Mexico's antitrust, unfair trade practice, racketeering, and criminal statutes. In a detailed opinion issued on October 2, 1985 (hereafter "the 1985 decision"), this court dismissed the complaint in its entirety as against three defendants for insufficient service of process, dismissed with prejudice a number of claims as against some defendants, and dismissed a limited number of claims without prejudice to Michelson's amending his complaint so as to remedy various defects in pleading. *See Michel-*

son, 619 F.Supp. at 742 (summary of rulings).

On November 4, 1985, Michelson filed an amended complaint (116 pages in length, containing 405 paragraphs of factual allegations) which substantially expands upon the original complaint (61 pages, 136 paragraphs). The number and nature of the legal claims remains essentially the same, except for the addition of a count (XXXVII) charging all defendants with violations of the New York antitrust law, N.Y.Gen. Bus.Law § 340 (McKinney 1987).

The amended complaint appears to have created some confusion in two respects. First, it realleges causes of action which the 1985 decision dismissed with prejudice and without leave to replead (*e.g.*, counts XXII–XXXII and XXXIV–XXXVI, alleged against Merrill Lynch and dismissed on *res judicata* grounds). Second, the amended complaint in its "Prayer" section (and, in one instance, in the description of a specific claim) seems to allege against all defendants claims which were pressed in the original complaint against Merrill Lynch alone (counts XIV, XV, XXVII, XXXII) or only against Merrill Lynch and the exchange defendants (count XXXIII). These discrepancies are explained in part by Michelson's decision to leave the original complaint's "Claims" section essentially unaltered in the interest of consistent numbering between the original and amended complaints and to utilize the "Prayer" section to specify the claims remaining against various defendants. *See* Plaintiff's Response to Motion to Dismiss at 15–16 (Feb. 20, 1986). In any event, the solution is to adhere to the determinations made in the 1985 decision, including the limited leave therein granted to amend the complaint in certain respects, and otherwise to bind plaintiff by his original complaint in the absence of a specific request for leave to amend pursuant to Rule 15 of the Federal Rules of Civil Procedure.

The motions to dismiss now pending are to a large extent reprises of the motions filed prior to the 1985 decision. Five different sets of motion papers have been submitted by the moving defendants,[1] and

---

1. The moving defendants are: Merrill Lynch, ACLI International Commodity Services, Inc.

the arguments raised in each will be considered separately or together with those of other defendants as convenience dictates. This decision seeks to accomplish three tasks: first, to eliminate any confusion over which claims and defendants are dismissed from the case under the holdings of the 1985 decision; second, to determine whether the amendments to the complaint that were permitted by the 1985 decision are sufficient to permit Michelson to go forward with certain claims; third, to consider a number of arguments not reached in the 1985 decision given the posture of the case at that time. Because of the number of claims, moving defendants, and overlapping arguments involved, as well as the importance of the 1985 decision both as the law of the case and as background, familiarity with the earlier opinion is assumed.

## I. MERRILL LYNCH

The 1985 decision held that counts XXII–XXXII and XXXIV–XXXVI were precluded in their entirety on *res judicata* grounds. *Michelson*, 619 F.Supp. at 732–34.[2] Counts III, VII, XII, XIII, and part of count IX were also dismissed with prejudice "to the extent that they relate to Merrill Lynch's decision to liquidate Michelson's account." *Id.* at 734–35.[3] With respect to counts XIV–XV, XXI, and XXXIII, the 1985 decision stated:

[W]hile they may be based upon unlawful conduct other than Merrill Lynch's

("ACLI"), Nelson Bunker Hunt, William Herbert Hunt, Douglas Herbert Hunt, and Lamar Hunt (collectively, "the Hunts"), Placid Oil Company ("Placid Oil"), International Metals Investment Co., Ltd. ("IMIC"), Prudential-Bache Securities, Inc. (formerly Bache Halsey Stuart Shields Incorporated) ("Prudential-Bache"), Board of Trade of the City of Chicago ("CBOT") and Commodity Exchange, Inc. ("COMEX") (collectively, "the exchanges"), John J. Conheeney, and Norton Waltuch. Merrill Lynch, the exchanges, Conheeney, Waltuch, and a coalition of nine nonexchange defendants have each filed separate submissions.

**2.** Although the text of the opinion failed in one place to include count XXXIV as one of the claims dismissed with prejudice, *Michelson*, 619 F.Supp. at 734, this omission was inadvertent. A footnote to the text and the opinion's final summary paragraph make clear that count

decisions to issue margin calls and to liquidate Michelson's account—issues conclusively adjudicated in the New Mexico proceedings, Michelson has not described with sufficient particularity the acts of Merrill Lynch that purport to be the bases for these claims. Accordingly, [they] will be dismissed with prejudice unless ... Michelson amends his complaint to re-plead these claims with required particularity.

*Id.* at 735 (footnotes omitted). These claims will now be examined.

### A. *Breach of Contract (Count XXI)*

Count XXI alleges that Merrill Lynch breached its contract with Michelson as a result of the manner in which it dealt with his account from 1976 through January 10, 1980. Count XXI of the amended complaint is identical to its predecessor. The language of the claim describes Merrill Lynch's conduct during the 1976–80 period as "negligent, reckless and unbusinesslike and in contravention of the contracts and rules and regulations which formed the basis of Merrill Lynch's handling of the Michelson account" and "imprudent and/or unreasonable and/or taken in bad faith." The factual allegations underlying the claim, however, either relate exclusively to the events surrounding the issuance of margin calls and the liquidation of Michelson's account that have already been deemed to be *res judicata* or fail to provide

XXXIV was dismissed with prejudice and without leave to replead. *Id.* at 734 n. 7 & 742.

**3.** To the extent that count III, which alleges that all defendants violated the Robinson-Patman Act, 15 U.S.C. § 13 (1982), relates to allegations regarding Merrill Lynch's participation in the general conspiracy among the defendants to corner the silver market, it is dismissed for failure to state a claim for the reasons stated in part IV–A of the 1985 decision. *See Michelson*, 619 F.Supp. at 738.

The part of count IX which alleged in the original complaint that Merrill Lynch accelerated Michelson's payment on his account in bad faith in violation of New Mexico law, N.M.Stat. Ann. § 55–1–208 (1978), was dismissed for reasons of *res judicata* with prejudice and without leave to replead and is not pleaded in the amended complaint.

support for a cause of action for breach of contract. *See* Amended Complaint ¶¶ 363–403. Nothing in the expanded paragraphs of factual allegations corrects this deficiency. Accordingly, count XXI is dismissed with prejudice.

## B. *New Mexico Racketeering Act (Counts XIV–XV)* [4]

Counts XIV and XV can be read as claims against Merrill Lynch [5] under New Mexico's civil RICO law, N.M.Stat.Ann. §§ 30–42–1 to 6 (Supp.1986), which are predicated upon Merrill Lynch's allegedly having engaged in, or having attempted to engage in, acts of fraud or extortion in violation of New Mexico's criminal statutes, N.M.Stat.Ann. §§ 30–16–6 (fraud); 30–16–9 (extortion); 30–28–1 (attempt to commit felony). Merrill Lynch moves to dismiss these claims first, on the ground that they are precluded by the doctrine of *res judicata*, and second, for failure to state a claim.

■ Although much of the amended complaint is devoted to factual allegations which under the previous holding as to *res judicata* cannot serve as the basis for viable claims under the New Mexico racketeering statute, Michelson does plead acts by Merrill Lynch apart from the events immediately surrounding the liquidation of his account which would appear to support the allegation of fraud as a predicate to the racketeering claim. *See, e.g.,* Amended Complaint ¶¶ 183, 184, 192, 193, 195, 197, 199, 200–05. (Portions of the amended complaint which appear to relate to acts of

extortion, however, do not appear to refer to any events other than those involved with the matters already found to be *res judicata. See, e.g., id.* at ¶¶ 188–91.) Consequently, to the extent counts XIV–XV are predicated on fraud, they would not be precluded by the doctrine of *res judicata.*

Merrill Lynch contends, nevertheless, that these counts fail to state a claim under the New Mexico racketeering statute. The New Mexico Racketeering Act is closely modeled after the analogous federal statute, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68 (1982), and in the absence of any authority cited by the parties which construes the state statute, this court must be guided by interpretations of the federal law. In order to allege a cause of action under N.M.Stat.Ann. § 30–42–4(C), the provision Michelson is assumed to be proceeding under, a plaintiff must plead both a "pattern of racketeering activity" and an "enterprise." [6]

According to Merrill Lynch, Michelson's pleading fails in both respects. First, Merrill Lynch asserts that although the statute requires that at least one predicate act of racketeering occur after the statute's effective date—February 28, 1980—the complaint does not allege any racketeering activity by Merrill Lynch after January 10, 1980, when Michelson's futures contracts were liquidated. Second, Merrill Lynch argues that not only does Michelson fail to plead what constitutes the "enterprise" for purposes of his claims, but also that a

---

**4.** Merrill Lynch's argument that the United States Constitution bars the application of New Mexico law as to it is rejected, as explained below in part II–A.

**5.** Counts XIV and XV are considered to be alleged against Merrill Lynch alone, since the plaintiff is bound by his original pleading in this respect.

**6.** N.M.Stat.Ann. § 30–42–4(C) provides in pertinent part:

It is unlawful for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs by engaging in a pattern of racketeering activity.

The statute defines "enterprise" to mean

any sole proprietorship, partnership, corporation, business, labor union, association or other legal entity or any group of individuals associated in fact although not a legal entity, and includes illicit as well as licit entities,

N.M.Stat.Ann. § 30–42–3(C), and "pattern of racketeering activity" to mean

engaging in at least two incidents of racketeering with the intent of accomplishing any of the prohibited activities set forth in ... Section 30–42–4 ... provided at least one of such incidents occurred after the effective date of the Racketeering Act and the last of which occurred within five years after the commission of a prior incident of racketeering,

N.M.Stat.Ann. § 30–42–3(D).

corporate defendant cannot be both the "enterprise" and the "person" charged with violating the statute when the operative provision is 18 U.S.C. § 1962(c), the analog to N.M.Stat.Ann. § 30–42–4(C), citing *Bennett v. United States Trust Co.*, 770 F.2d 308, 315 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed. 2d 776 (1986).

■ The amended complaint survives both these challenges. As to the timing of the predicate acts, paragraph 225 of the amended complaint alleges that Conheeney, an officer of Merrill Lynch, convened a meeting of those involved in the conspiracy to corner the silver market as late as March 22, 1980, in order to discuss the final steps in the conspiracy. Whether Conheeney was acting individually in a conspiracy with Merrill Lynch or as its employee, the act would be chargeable to Merrill Lynch for the purposes of pleading a racketeering violation.

■ With respect to Michelson's failure to specify the nature of the racketeering "enterprise," a fair reading of the complaint reveals that the enterprise is alleged to consist in the whole range of individuals and entities who, in the words of the statute, were "associated in fact" for the purpose of carrying out the conspiracy. *See* Amended Complaint ¶ 53 ("The defendants, acting individually and collectively, constitute an enterprise or enterprises. The person[s] who participated in the conduct of the affairs of such enterprises include employees, representatives and associates of the defendants as well as the defendants themselves.") This court has held in another "silver" case that even in the absence of explicit pleading it could be inferred from an otherwise informative complaint that a group of corporations or individuals, each named as a defendant, constituted an "enterprise," *i.e.,* association in fact, consistent with the rule stated in the *Bennett* case. *See Fustok v. Conticommodity Services, Inc.,* 618 F.Supp. 1074 (S.D.N.Y.1985) (citing *Haroco v. American National Bank*

*and Trust Co.,* 747 F.2d 384, 401 (7th Cir. 1984), *aff'd on other grounds,* 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985)). The fact that the other defendants alleged to be associators with Merrill Lynch are not charged under the New Mexico statute is immaterial.

Accordingly, the motion by Merrill Lynch to dismiss counts XIV and XV is granted to the extent the claims stated therein are predicated on extortion or attempted extortion and denied in all other respects.

### C. *Commodity Exchange Act ("CEA") § 4c (Count XXXIII)*

Count XXXIII alleges that Merrill Lynch and the exchanges[7] violated section 4c of the CEA, 7 U.S.C. § 6c (1976 & Supp. V 1981), in that on the day his trading account was liquidated, "there were no bona fide buyers and sellers in the silver of the CBOT and ... the execution of the order [which liquidated his account] was a fictitious sale and/or accommodation trade" prohibited under the statute. With respect to count XXXIII, the 1985 decision stated:

> We note that Michelson has alleged Merrill Lynch executed "wash sales" to maintain the appearance of a legitimate silver market and that such a claim might support a section 4c claim, provided, of course, that a private right of action is available under this provision. Count XXXIII, however, addresses only Merrill Lynch's act of liquidating Michelson's account and, for the reasons discussed above, is barred by *res judicata.*

*Michelson,* 619 F.Supp. at 735 n. 9 (citation omitted).

■ Michelson has failed to amend his claim statement in any way that would cure the deficiency noted above. Moreover, only three factual allegations in the amended complaint would appear to provide support for the claim. The only one that specifically refers to Merrill Lynch merely restates the claim. Amended Complaint ¶ 404. The other two paragraphs make reference to "cross trading" and "fic-

**7.** Count XXXIII is considered to be alleged only against Merrill Lynch and the exchanges, notwithstanding plaintiff's amendment of the claim

to allege a violation against all defendants, since he is bound by the original complaint in this respect.

titious sales," [8]—both practices which violate section 4c(a)—but allege only generally that such activity was a means to the accomplishment of the conspiracy. *Id.* at ¶¶ 86, 329; *see also id.* at ¶ 382. The absence of a direct reference to Merrill Lynch, especially in light of the claim statement's continuing reference only to the events of January 10, 1980, prevents these allegations from rescuing the section 4c claim against Merrill Lynch.[9] Consequently, count XXXIII is dismissed with prejudice as to Merrill Lynch.

## II. CERTAIN NONEXCHANGE DEFENDANTS [10]

### A. *New Mexico Law, Generally (Counts V–IX & XIV–XVI)* [11]

The 1985 decision held that the due process clause of the fourteenth amendment to the United States Constitution barred the application of New Mexico law as to six defendants—ACLI, the Hunts, and Placid Oil—who had been dismissed from the case, prior to its transfer to this district, for lack of personal jurisdiction. In light of the prior findings of the federal district court in New Mexico regarding the absence of contacts between the state of New Mexico and both the claims asserted against the six defendants and the defendants themselves, it was determined that the connection between those defendants and New Mexico was sufficiently tenuous so as to prevent Michelson as a matter of due process from basing his claims upon that state's laws. The pendent state law claims in the complaint were accordingly dismissed with prejudice as against the six defendants, and Michelson was granted leave to amend the complaint to assert new claims under New York law. *See Michelson,* 619 F.Supp. at 738–39. The other moving nonexchange defendants, who had not been dismissed from the case prior to transfer for lack of personal jurisdiction, were permitted to file supplementary affidavits containing facts needed to determine whether claims against them based on New Mexico law were viable. *Id.* at 739.

All the nonexchange defendants now move to dismiss all the New Mexico counts asserted against them on the basis of the prior holding. Their arguments are considered in turn.

*ACLI, the Hunts, Placid Oil:* These six defendants move on the basis of the 1985 decision to dismiss the remaining claims asserted against them under Mexico law.[12] Their motion is granted. Counts V–VI and VIII are dismissed with prejudice.

■ *IMIC:* IMIC has submitted an affidavit stating that it is a Bermuda corporation which carries on its activities from its

---

**8.** A "cross trade" is understood to mean a noncompetitive trade made by matching the orders of two customers, either directly or through an intermediary, without offering them openly to all traders in the pit or ring. P. Johnson, *Commodities Regulation* § 3.94 at 528 (vol. 1), § 5.38 at 309–10 (vol. 2) (1982). The term "fictitious sale," although of uncertain meaning, seems to embrace situations in which a trade is reported that did not in fact take place. *Id. See also Merrill Lynch Futures Inc., v. Kelly,* 585 F.Supp. 1245, 1251 n. 3 (S.D.N.Y.1984).

**9.** In light of this finding, Merrill Lynch's arguments that count XXXIII should be dismissed (1) because there is no private right of action under CEA section 4c for causes of action accruing prior to 1983, *see* CEA § 22(d), 7 U.S.C. § 25(d), and (2) because Michelson has failed to state a claim under that section, are not considered. With regard to the latter point, however, it should be noted that given the highly technical nature of section 4c's prohibitions it would in this court's view be necessary to plead the specific trades and reports that are alleged to violate the statute in order to state a claim. Thus, even if count XXXIII could be read as charging Merrill Lynch with a section 4c violation unrelated to the January 10, 1980 transaction, it would not survive a motion to dismiss.

**10.** Nine nonexchange defendants move jointly in various combinations to dismiss a number of the claims. They are: ACLI, the Hunts, Placid Oil, Merrill Lynch, IMIC, and Prudential-Bache. They are sometimes referred to in this section collectively as "the nonexchange defendants" or "the defendants."

**11.** As indicated above in note 5, the amended complaint is deemed to allege counts XIV and XV (New Mexico racketeering claims) against Merrill Lynch alone.

**12.** The 1985 decision dismissed only counts VII, IX, and XVI because these were the only claims for which dismissal was sought at the time. *See Michelson,* 619 F.Supp. at 738 & n. 16.

offices in Hamilton, Bermuda, and that at no time since its incorporation in 1979 has it ever maintained an office, engaged in trading activities, stored precious metals, or financed its trading activities through lending institutions in the state of New Mexico. Affidavit of Robert L. Guinn, Co-Managing Director (Jan. 14, 1986). On the basis of this affidavit, IMIC contends that it merits the same treatment as the six defendants covered by the holding in the 1985 decision. Although IMIC was not dismissed for lack of personal jurisdiction in the New Mexico phase of this proceeding, it appears from the uncontroverted facts it avers and from a reading of the relevant New Mexico federal district court opinions issued in this case that it would have been had it so moved for dismissal at that time. Consequently, IMIC is found to be similarly situated with the aforementioned six defendants, and its motion is granted. Counts V–IX and XVI are dismissed with prejudice as to it as well.

*Merrill Lynch and Prudential-Bache:* Although both Merrill Lynch and Prudential-Bache have submitted affidavits which describe the extent of their activities in New Mexico, neither contends that it would not have been subject to personal jurisdiction in New Mexico at the time Michelson filed the initial complaint in this case. Both defendants maintain offices in Albuquerque, New Mexico: Merrill Lynch, at all times relevant to this action, Amended Complaint ¶ 363; Prudential-Bache, since 1982, Affidavit of Frederick F. Horn, Vice President (Jan. 17, 1986). Rather, defendants argue that apart from the bald allegation that "conspirators' acts were committed in New Mexico," which appears in a number of the complaint's early paragraphs, and those allegations relating to Merrill Lynch's handling of Michelson's account which have been found to be *res judicata*, the complaint fails to allege any nexus between the acts and transactions of the conspiracy in which they are charged with having participated and the state of New Mexico. According to Merrill Lynch and Prudential-Bache, the claims based on New Mexico law should be dismissed as to them as well since "the Due Process Clause

prohibits an arbitrary application of a state's jurisprudence to an out-of-state event," *Pearson v. Northeast Airlines, Inc.,* 309 F.2d 553, 563 (2d Cir.1962) (en banc), *cert. denied,* 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963).

■ The argument advanced by the defendants is not frivolous. It is true " 'that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.' " *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818, 105 S.Ct. 2965, 2978, 86 L.Ed.2d 628 (1985) (quoting *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 312–13, 101 S.Ct. 633, 640, 66 L.Ed.2d 521 (1981)). It is also true that the issue of personal jurisdiction is not coincident with the question of the constitutional limitations, however modest, on the application of a particular state's law. *Id.* at 821, 105 S.Ct. at 2980. Nevertheless, conceding that the situation of Prudential-Bache presents a closer case than that of Merrill Lynch due to its more recent arrival in the state, it does not seem arbitrary or unfair in a constitutional sense to apply New Mexico law to these defendants. Aggregating the plaintiff's residence and trading base with the fact of personal jurisdiction over the defendants would not appear to yield such a tenuous contact with the claims asserted in this litigation as to preclude Michelson from relying on New Mexico law with respect to these two defendants.

Accordingly, the motions of Merrill Lynch and Prudential-Bache to dismiss all the New Mexico law claims on due process grounds are denied.

### B. *New Mexico Criminal Conspiracy (Count XVI)*

Count XVI asserts a cause of action against all defendants under N.M.Stat.Ann. § 30–28–2 (1984), New Mexico's criminal conspiracy statute, which provides that "[a] conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this

state." The statute does not provide for a private right of action, and there appears to be no New Mexico authority in support of a private plaintiff's right to a civil remedy under the law. Defendants move to dismiss for failure to state a claim.

The general rule applied by federal courts is that while provision of a criminal penalty will not necessarily preclude the implication of a private cause of action for damages, "implied causes of action are disfavored and should be found only where a statute clearly indicates that the plaintiff is one of a class for whose benefit the statute was enacted and there is some indication that Congress intended such a cause of action to lie." *Flowers v. Tandy Corp.,* 773 F.2d 585, 589 (4th Cir.1985) (citing *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1974), and *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 2489, 61 L.Ed.2d 82 (1979)). Moreover,

> a "bare criminal statute," which contains absolutely no indication that a civil remedy is available, does not provide a basis from which to infer a private cause of action. Congressional intent to create such a remedy, the most important factor to consider when determining if an implied private remedy exists, cannot be found on the face of such a statute.

*Creech v. Federal Land Bank of Wichita,* 647 F.Supp. 1097, 1099 (D.Colo.1986) (citations omitted). Not only is the New Mexico provision in question a "bare criminal statute," but it is clearly intended to benefit the public at large rather than a special class of which Michelson is a member. It is instructive in this regard that courts have held that a violation of the federal

conspiracy statute, 18 U.S.C. § 371, does not give rise to a civil cause of action. *See Lamont v. Haig,* 539 F.Supp. 552, 558 (D.S. D.1982); *Fiorino v. Turner,* 476 F.Supp. 962, 963 (D.Mass.1979).[13]

Accordingly, the nonexchange defendants' motion to dismiss for failure to state a claim is granted, and count XVI is dismissed with prejudice.

### C. New Mexico Price Discrimination and Unfair Trade Practice Laws (Counts VII & IX)

Count VII charges all defendants with violating the New Mexico Price Discrimination Act, N.M.Stat.Ann. §§ 57–14–1 to 9 (1978). Count IX of the amended complaint alleges that all defendants violated the New Mexico Unfair Practices Act, N.M. Stat.Ann. §§ 57–12–1 to 20 (1978). The 1985 decision dismissed both claims as to Merrill Lynch on *res judicata* grounds to the extent they relate to Merrill Lynch's handling of Michelson's account.[14] The nonexchange defendants now move to dismiss the claims in their entirety for failure to state a claim.

#### 1. Price Discrimination

Michelson specifically alleges in count VII (incorporating by reference his pleading in count III) that all defendants "directly or indirectly discriminated in price and/or in other ways between different purchasers of commodities, namely silver, of like grade and quality ... and the effect of such discrimination was substantially to lessen competition or tend to create a monopoly" in violation of N.M.Stat.Ann. § 57–14–6. That section of the statute, whose terms appear never to have been construed by a court in a published decision, is set out in the margin.[15]

---

**13.** To the extent Michelson intended in counts XIV and XV, *see supra* text at note 5, to state a private right of action under New Mexico's criminal fraud, extortion, and attempt statutes (as opposed to stating a racketeering claim, which is how this court reads the complaint), this analysis also applies to bar those claims.

**14.** *See supra* text at note 3.

**15. 57–14–6. Customer Discrimination.**
It is unlawful for any person engaged in commerce:

A. to pay or contract for payment of anything of value to or for the benefit of a customer as compensation for any services or facilities furnished by or through the customer in connection with the processing, handling, sale or offering for sale of any products or commodities manufactured, sold or offered for sale unless the payment or compensation is available on proportionally equal terms to all other customers competing in the distribution of the products or commodities;

B. to discriminate in favor of one purchaser against another purchaser of a commodity

In order for count VII to state a claim under the statute, several assumptions must be made. First, because the claim does not specify the type of discrimination alleged, it must be inferred that Michelson is referring to discrimination in margin terms—the only type of price discrimination, direct or indirect, which can be gleaned from the underlying factual allegations. *See* Amended Complaint ¶¶ 202, 327–28. Second, it must be assumed that offering different credit terms to different customers can, on the basis of the thin allegations in the amended complaint, state a claim for price discrimination under the statute. Federal cases construing the Robinson-Patman Antidiscrimination Act, 15 U.S.C. § 13, on which the New Mexico Price Discrimination Act is closely modelled, have taken a narrow view of whether credit term differences can constitute price discrimination, *see Craig v. Sun Oil Company of Pennsylvania*, 515 F.2d 221, 224 (10th Cir.1975), *cert. denied*, 429 U.S. 829, 97 S.Ct. 88, 50 L.Ed.2d 92 (1976); *Petroleum for Contractors, Inc. v. Mobil Oil Corp.*, 493 F.Supp. 320, 326–28 (S.D.N.Y. 1980), although a claim of discrimination in credit terms which is alleged to be of extreme magnitude may survive a motion to dismiss, *see Craig*, 515 F.2d at 224; *Robbins Flooring v. Federal Floors, Inc.*, 445 F.Supp. 4, 9–10 (E.D.Pa.1977).

A third necessary assumption is that what the amended complaint is actually alleging is discrimination in price between different purchasers of brokerage services —not silver, as the claim statement reads— since Michelson does not appear to allege that defendants discriminated on the basis of silver prices. *See Michelson,* 619 F.Supp. at 738 (discussing count III).[16]

■ Even if all these assumptions were made, however, Michelson would still have failed to state a cause of action under N.M.Stat.Ann. 57–14–6, for his claim does not come within any of that provision's three sections. Section (C) makes it a violation "knowingly to induce or receive a discrimination in price," and is directed to the beneficiary of the discrimination, not the perpetrator. However, the complaint does not allege a violation of the statute against specific customers in this regard. Section (B) prohibits discrimination "in favor of one purchaser against another purchaser of a commodity bought for resale," but the brokerage services Michelson purchased were not obtained for resale. Section (A) refers to discriminatory payments to customers in return for services furnished by or through the customers in connection with the handling or sale of commodities distributed by those customers—a situation which does not match up with the allegations in the complaint. It is also instructive to note that the federal courts have held that discrimination in credit terms does not violate sections 2(d) or (e) of the Robinson-Patman Act, 15 U.S.C. § 13(d), (e), which are the analog sections to N.M.Stat.Ann. § 57–14–6(A) and (B). *See Robbins Flooring,* 445 F.Supp. at 8 (citing cases); *see also Cole v. Ford Motor Co.,* 566 F.Supp. 558, 567–68 (W.D.Pa.1983) (section 2(e)) (services and facilities referred to are limited to advertising, promotion, and merchandising; services must concern purchaser's subsequent resale of the commodity; credit terms and financing are outside section's coverage).

### 2. *Unfair Trade Practices*

■ Count IX seeks damages from all defendants for the violation of N.M.Stat. Ann. § 57–12–3, which states only that "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce are unlaw-

---

bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of any services or facilities connected with the processing, handling, sale or offering for sale of the commodity purchased on terms not accorded to all purchasers on proportionally equal terms; or

 C. knowingly to induce or receive a discrimination in price which is prohibited by [this Act].

**16.** In contrast to the Robinson-Patman Act, upon which count III is based, the New Mexico Price Discrimination Act contains a definition of "commodity," which encompasses "any commercial service sold in commerce," N.M.Stat. Ann. § 57–14–2(D).

ful." The statute in question contains seventeen specific examples of an "unfair or deceptive trade practice," N.M.Stat.Ann. § 57–12–2(C)(1)–(17), and two definitions of an "unconscionable trade practice," N.M. Stat.Ann. § 57–12–2(D)(1), (2). The amended complaint, however, provides no clue as to the way in which defendants' acts are claimed to have violated the statute. The only aspect of the amended complaint to which the statute can be understood to apply at this level of pleading generality is the series of allegations regarding Merrill Lynch's handling and liquidation of Michelson's commodities account, but the claim has already been dismissed in this respect on *res judicata* grounds.

\* \* \*

Accordingly, the nonexchange defendants' motion to dismiss count VII for failure to state a claim and count IX for failure to plead with sufficient particularity the acts of the defendants which are the basis for the claim is granted, and counts VII and IX are dismissed with prejudice.

### D. *CEA & 4b (Count XI)* [17]

Count XI alleges that the conduct of all defendants "created a corner in the market or [was] an attempt to corner the market in violation of [CEA] section 9b [7 U.S.C. § 13(b) (Supp. V 1981)] and operated as a device to cheat or defraud in willful violation of [CEA] section 4b [7 U.S.C. § 6b (1982)]." The 1985 decision held that the complaint did not allege facts sufficient to state a claim under section 4b:

> Michelson's complaint relies upon a conclusory allegation that the defendants' acts amounted to fraud as a result of their efforts to corner the silver market. This allegation fails to specify the relationship between the parties so as to give rise to a cause of action under Section 4b. That portion of count XI will accordingly be dismissed with prejudice unless ... Michelson repleads the claim to allege the nature of his relationship with

the defendants which gives rise to a Section 4b claim.

> We note the possibility that because *res judicata* prevents Michelson from challenging the propriety of Merrill Lynch's decision to issue margin calls or to liquidate his account, he may be unable to allege a cause of action under this provision.

*Michelson,* 619 F.Supp. at 740 (citation omitted); *see also Korwek v. Hunt,* 646 F.Supp. 953, 971–73 (S.D.N.Y.1986) (claim under § 4b must allege a connection to a specific futures transaction).

■ Since the amended complaint does not remedy the defect noted in the earlier opinion, defendants' renewed motion to dismiss is granted, and that portion of count XI which alleges a violation of CEA § 4b is dismissed with prejudice.

### E. *RICO (Counts XII–XIII)*

Counts XII and XIII seek damages under the federal civil RICO law, 18 U.S.C. § 1964 (1982), predicated upon all defendants having committed acts of extortion (count XII) and mail and wire fraud (count XIII) in violation of 18 U.S.C. §§ 1341, 1343, and 1951. These claims have already been dismissed in part to the extent they relate to Merrill Lynch's liquidation of Michelson's account.[18] The nonexchange defendants now move to dismiss the two RICO claims in their entirety on the grounds that (1) they are barred by the applicable statute of limitations and (2) they fail to state a claim upon which relief may be granted.

■ The Supreme Court recently held that the four-year statute of limitations applicable to Clayton Act civil enforcement actions, 15 U.S.C. § 15b, applies uniformly to all civil RICO actions. *Agency Holding Corp. v. Malley-Duff & Assocs.,* — U.S. ——, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Because Michelson filed the original com-

---

**17.** Counts XXVII and XXXII, which also allege CEA § 4b violations, are considered to have been asserted against Merrill Lynch alone, consistent with the terms of the original complaint and notwithstanding their misleading categorization in the "Prayer" section of the amended

complaint. Both claims were dismissed with prejudice by the 1985 decision. *See supra* text at note 2.

**18.** *See supra* text at note 3.

plaint in this case less than four years after his futures account was liquidated, which is the earliest time his cause of action could have accrued, his RICO claims are timely brought.

Defendants' argument that Michelson has failed to state a claim appears to be two-fold: first, that the complaint fails to allege extortion, defined by the statute as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right," 18 U.S.C. § 1951(b)(2); second, that the complaint fails to allege mail and wire fraud with sufficient particularity—specifically, that the complaint does not differentiate among defendants with respect to the violations of §§ 1341 & 1343 alleged, identify the senders and recipients of the communications involved, or indicate the time and content of such communications.

The first part of defendants' argument has merit. The only paragraphs of the amended complaint that appear to charge any defendant with having committed extortionate acts are limited to descriptions of the events concerning the handling of Michelson's account by Merrill Lynch immediately prior to liquidation. Amended Complaint ¶¶ 188–91, 377, 379–80, 392. However, to the extent count XII relates to these events, it has already been dismissed, as discussed above. Count XII must therefore be dismissed for failure to allege predicate acts necessary to state a RICO claim.

 The second part of defendants' argument is less persuasive. The amended complaint does refer to communications made in furtherance of the alleged scheme in several paragraphs. *See, e.g.,* Amended Complaint ¶¶ 66, 80, 82, 83, 136, 297, 354. But more significantly, it contains long sections describing the roles of individual defendants in a conspiracy to raise silver prices, *id.* at ¶¶ 90–232, 285–311, from which the only reasonable inference to be drawn is that the various communications described or implied as necessary to the

fraudulent scheme alleged were effectuated through the use of the interstate or U.S.-international mails and wires. If it is kept in mind that *pro se* complaints are held to less stringent standards than formal pleadings drafted by lawyers, *see Haines v. Kerner,* 404 U.S. 519, 520–21, 92 S.Ct. 594, 596, 30 L.Ed.2d 652 (1972) (per curiam), especially in the technical area of RICO pleading, it is fair to say that the fraud allegations underlying the RICO claim in count XIII survive defendants' challenge.

Accordingly, the motion to dismiss is granted as to count XII and denied as to count XIII, and count XII is dismissed with prejudice.

## III. THE EXCHANGES

The 1985 decision found that the complaint's allegations (1) that the exchanges undertook actions in order to further the conspiracy among the defendants to corner the supply of silver in the world market and (2) that the exchanges failed to take emergency action soon enough to preserve an orderly silver market were not sufficient to state a claim against the exchanges in the absence of an averment that bad faith tantamount to fraud was the dominant motivation underlying their conduct. The decision held that in order to state a claim based on the first kind of allegation, it was necessary to allege that " 'self-interest or other ulterior motive unrelated to proper regulatory concerns ... constitute[d] the sole or dominant reason for the exchange action,' " *Michelson,* 619 F.Supp. at 736 (quoting *Sam Wong & Son v. New York Mercantile Exchange,* 735 F.2d 653, 677 (2d Cir.1984)), and similarly, that in order to state a claim based on the second type of allegation, it was necessary to allege that an exchange intentionally failed to maintain an orderly market out of its own self-interest, *id.* at 737 (citing *Gordon v. Hunt,* 558 F.Supp. 122, 123–24 (S.D.N.Y. 1982), and *Minpeco, S.A. v. ContiCommodity Services, Inc.,* 552 F.Supp. 332, 340 (S.D.N.Y.1982)).[19] The complaint was ac-

---

**19.** The Court of Appeals for the Second Circuit continues to apply the "bad faith" standard to

claims that an exchange or its officials acted or failed to take action to the detriment of others

**1258**

cordingly dismissed as against the exchanges, but Michelson was given permission to amend the complaint to cure the deficiencies noted. *Id.* at 737.

 A close reading of the amended complaint reveals that Michelson has succeeded in alleging that the exchanges' acts of commission as well as omission were taken in bad faith in that their sole or dominant motive was self-interest. The amended complaint alleges that the burgeoning silver futures trading volume created by the alleged conspiracy served the financial interests of the exchanges and their members, that the members of the exchanges' boards of governors included persons who were either directly involved in trading for other defendants or represented member firms which were receiving substantial commissions from the other defendants, and that some of these member firms had lent and were continuing to lend substantial sums of money to other defendants for silver futures purchases. Amended Complaint ¶¶ 258–59. Such allegations have been found in the past to satisfy the bad faith standard, where bad faith is defined as an ulterior motive such as personal gain. *See Gordon,* 558 F.Supp. at 124 (considering similar pleadings). When these allegations are read together with those in the complaint which assert that the conduct of the exchanges was not necessary to fulfill any purpose of the CEA, served no sound regulatory purpose, and was not in the public interest, *id.* at ¶¶ 357, 360, 362, the amended complaint effectively pleads that self-interest was the sole or dominant reason for the exchange actions. *See Bishop v. Commodity Exchange, Inc.,* 581 F.Supp. 1278 (S.D.N.Y.1984).[20]

It therefore becomes necessary to consider the additional arguments raised by the exchanges supporting dismissal of individual claims against them.

**A. New Mexico Law (Counts V–IX & XVI)**

The exchanges were dismissed from the case, prior to transfer to this district, for lack of personal jurisdiction. *See Michelson v. Merrill Lynch Pierce Fenner & Smith, Inc.,* No. 83–1099–M Civil, slip op. (D.N.M. Oct. 7, 1983); *id.,* No. 83–1099–M Civil, slip op. (D.N.M. Oct. 28, 1983) (on reconsideration), *reprinted in* Memorandum of Certain Defendants in Support of Their Motions To Dismiss at Exhibits M & N (Jan. 18, 1986). Consequently, for the reasons discussed above in part II–A, the exchanges cannot be held liable to Michelson under New Mexico law. Counts V–IX and XVI are therefore dismissed with prejudice as to the exchanges.

**B. Federal Antitrust Law (Counts I–IV)**

**1. Sherman Antitrust Act §§ 1 & 2**

Counts I and IV charge all defendants with a conspiracy to unreasonably restrain interstate trade with the intention of raising and fixing the price of silver in violation of section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1 (1982). Count II charges all defendants with monopolizing or attempting to monopolize interstate trade in silver in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (1982). As against the exchanges, who are not actual competitors in the silver market and thus cannot monopolize or attempt to monopolize the market, count II must be understood as alleging only conspiracy to monopolize trade. *See Strobl v. New York*

---

in connection with the exchange's performance of its statutory duty to maintain a fair and orderly market. *See Apex Oil Co. v. DiMauro,* 822 F.2d 246, 261 (2d Cir.1987), *aff'g in part, rev'g in part* 641 F.Supp. 1246 (S.D.N.Y.1986); *Brawer v. Options Clearing Corp.,* 807 F.2d 297, 302–303 (2d Cir.1986); *but see Apex,* at 260 (not reaching issue of whether bad faith is necessary element of antitrust claim against exchange), *commenting on* 641 F.Supp. at 1282.

**20.** The exchanges' argument that it is inconceivable that Michelson could allege in good faith

that the exchanges acted in bad faith in light of the contrary findings contained in the report of the Commodity Futures Trading Commission's ("CFTC") Division of Trading and Markets, *see* CFTC, *The Silver Market of 1979/1980* at 681 (November 1985), presents a question of fact which cannot be resolved on a motion to dismiss. The question of the weight to be given to the CFTC's evaluation of the exchanges' actions must await a more fully developed record. *Gordon v. Hunt,* 558 F.Supp. at 124.

*Mercantile Exchange,* 561 F.Supp. 379, 383 n. 5 (S.D.N.Y.1983).

■ The exchanges move to dismiss these antitrust claims on a number of grounds, among them that the complaint fails to allege that the exchanges agreed with anyone to take action or not to take action with the intent of furthering the conspiracy. This argument is sufficient to warrant dismissal of the claims. Indeed, the amended complaint's factual allegations tend to rebut even an inference that the exchanges participated in the conspiracy:

> Commencing as early as 1973, the defendants (except COMEX and CBOT), acting individually and in concert, through controlled persons, entities, accounts and otherwise, through agents and with other coconspirators who are unknown or otherwise not named as defendants, engaged in a manipulative and fraudulent scheme, and an unlawful conspiracy. (¶ 32)

> Notwithstanding the exchanges' knowledge of the other defendants' unlawful scheme and conspiracy, the exchanges continued to allow these other defendants to use the facilities of the exchanges without effecting regulatory controls, even though they were under a statutory duty to plaintiff and other members of the public to prevent this. (¶ 257)

> The exchanges CBOT and COMEX are not included in either group [of coconspirators, *see* ¶¶ 285–88] but through their officers and board members were involved in taking certain acts which furthered the conspiracy and were detrimental to non exchange interest. They negligently or willfully failed to carry out the duties of a contract market.... (¶ 289)

Other allegations in the complaint which aver that the acts of the exchanges furthered the conspiracy or that the conspiracy had the acquiescence of members of the exchange boards are simply too vague to support these antitrust claims against the exchanges. *See* Amended Complaint ¶¶ 267, 314, 325. This court's holding in

*Minpeco, S.A. v. ContiCommodity Services, Inc.,* 552 F.Supp. 327 (S.D.N.Y.1982), is applicable here:

> [I]t is unclear whether Minpeco means to charge that the exchanges' alleged failure to carry out their duties simply permitted the remaining defendants to proceed with their conspiracy, or whether the exchanges are alleged to have neglected their duties *for the purpose of participating* in the conspiracy. Even if the exchanges had neglected their duties out of bad faith, that is, out of a desire to injure plaintiff, that alone would not make them participants in a conspiracy. Conspiracy requires agreement, and it is far from clear that the complaint alleges the exchanges to have conspired with anyone.

*Id.* at 331–32 (emphasis in original) (failure to sufficiently plead conspiratorial intent); *see also Grosser v. Commodity Exchange, Inc.,* 639 F.Supp. 1293, 1309–11, 1316–17 (S.D.N.Y.1986) (failure to state claim considered together with basis for long-arm jurisdiction).

### 2. *Robinson-Patman Antidiscrimination Act*

Count III alleges that defendants violated the Robinson-Patman Antidiscrimination Act, 15 U.S.C. § 13 (1982).[21] The exchanges move to dismiss count III on the ground that the dismissal of the Robinson-Patman Act claim as to the nonexchange defendants in the 1985 decision warrants dismissal as to them as well.

■ The 1985 decision found that the only possible inference from the complaint of allegations of discrimination on the basis of price among silver purchasers—discrimination among purchasers of brokerage services—could not support a claim under the Robinson-Patman Act since brokerage services do not constitute "commodities" within the meaning of the statute. *Michelson,* 619 F.Supp. at 738 (citing *Gordon v. New York Stock Exchange, Inc.,* 498 F.2d 1303, 1305 n. 7 (2d Cir.1974), *aff'd on other*

---

**21.** *See supra* text at note 15 for the wording of the claim.

*grounds,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975)). This holding is no less applicable to the exchanges than to the nonexchange defendants, against whom count III was dismissed with prejudice in the earlier opinion.

\* \* \*

Accordingly, the exchanges' motion to dismiss counts I–IV is granted, and those counts are dismissed with prejudice.

### C. CEA Claims (Counts X–XI, XVII–XX & XXXIII)

The amended complaint alleges a number of CEA claims against the exchanges, among other defendants. The exchanges move to dismiss all the CEA claims on the ground that they are barred by the applicable statute of limitations and certain of the claims on the ground that they fail to state a cause of action. The limitations argument is addressed first.

The question of which limitations period to apply to a CEA claim accruing prior to the adoption by Congress of a two-year statute of limitations governing express private rights of action under the statute, CEA § 22(c), 7 U.S.C. § 25(c) (1982), has been the subject of several of this court's opinions in recent years. *See Korwek v. Hunt,* 646 F.Supp. 953 (S.D.N.Y.1986); *Grosser v. Commodity Exchange, Inc.,* 639 F.Supp. 1293 (S.D.N.Y.1986); *Fustok v. ContiCommodity Services, Inc.,* 618 F.Supp. 1076 (S.D.N.Y.1985). Earlier decisions have held that it is more appropriate to "fill the gap" left by the absence of a federal statute of limitations for such causes of action by looking to the limitations rules of the forum state rather than borrowing the limitations period applicable to analogous provisions of the CEA itself. *See Fustok,* 618 F.Supp. at 1078–80; *Grosser,* 639 F.Supp. at 1298–99.[22] Reference

to the law of the forum, in turn, requires recourse to New York's borrowing statute, N.Y.Civ.Prac.Law § 202 (McKinney 1972), which provides that a nonresident plaintiff's claim should be governed by the shorter of either the applicable New York statute of limitations or the applicable rule of limitation in the state where the cause of action accrued. For borrowing statute purposes, a cause of action accrues at the place of injury, *Stafford v. International Harvester Co.,* 668 F.2d 142, 148–50 (2d Cir.1981), and under the "place of injury" rule, a cause of action for fraud or related statutory violations is considered to arise where the loss is sustained, which is deemed to be the place where its economic impact is felt, normally the plaintiff's residence. *Sack v. Low,* 478 F.2d 360, 366 & n. 2 (2d Cir.1973) (Friendly, C.J.).

These ground rules pose several questions. First, what is the New York limitations period which is most appropriately applied to CEA claims? "[T]he guiding principle is that in the absence of case law directly on point or a state commodity fraud statute and an accompanying rule of limitation, the most appropriate state limitations period is that which federal courts sitting in that state apply to federal securities fraud causes of action." *Korwek,* 646 F.Supp. at 968. There is no definitive ruling on which New York limitations period applies to CEA claims, and New York has no statute of limitations governing commodities or securities fraud. However, federal courts customarily apply the six-year statute of limitations for common law fraud, N.Y.Civ.Prac.Law § 213(8) (McKinney Supp.1987), to federal securities fraud actions. *See Armstrong v. McAlpin,* 699 F.2d 79, 86 (2d Cir.1983).[23]

---

**22.** The exchanges' suggestion that the most suitable rule of limitation for an implied private right of action under the CEA is the two-year period already embodied in the federal regulatory scheme in CEA sections 22(c), 7 U.S.C. § 25(c) (express private right of action), and 14(a), 7 U.S.C. § 18(a) (administrative reparations proceedings), is rejected for the reasons explained in *Fustok* and *Grosser.*

**23.** The exchanges contend that the more appropriate New York limitations period is N.Y.Civ. Prac.Law § 214(2) (McKinney 1972), which imposes a three-year rule of limitation on actions to recover upon a liability, penalty or forfeiture created or imposed by statute. They rely on this court's decision in *Hornblower & Weeks-Hemphill, Noyes v. Burchfield,* 366 F.Supp. 1364 (S.D.N.Y.1973), in which § 214(2) was held to apply to an investor's claim against his broker for violation of margin regulations issued by the

■ Second, in what state did Michelson's cause of action accrue? Michelson was a resident of New Mexico at the time he suffered his losses, and in the usual case this would be the place where the economic impact of the loss was felt—and hence where the claim accrued for borrowing statute purposes. Although there is authority for the proposition that "the plaintiff's residence need not necessarily be the situs of the economic impact of the fraud, and the court can properly consider all the relevant factors in determining where the loss was felt," *Lang v. Paine, Webber, Jackson & Curtis, Inc.*, 582 F.Supp. 1421, 1425 (S.D.N.Y.1984), the other factors—how and where plaintiff paid for the commodity futures, where plaintiff maintained the trading account in which the loss was reflected, and the manner in which the securities were handled, *Sack v. Low*, 478 F.2d at 367–68—all point to New Mexico.[24]

■ Third, which New Mexico limitations period would a federal court sitting in that state apply to a cause of action under

---

Federal Reserve Board, on the reasoning that "[m]argin violations were of course unknown to the common law ... and a cause of action would not exist but for the presence of a statute which provides a basis for it." *Id.* at 1366. The gist of the argument appears to be that at least some of the CEA claims alleged by Michelson, such as those premised upon the exchanges' failure to fulfill their duty to maintain an orderly market, *see, e.g.,* § 5a(8), 7 U.S.C. § 7a(8), also would not exist but for the presence of the statute.

The reliance on *Hornblower* is misplaced. That decision was careful to note:

> In holding as we do, we recognize that in other circumstances claims of margin violations may constitute part of a § 10(b) claim under the Exchange Act, in which case the six year (fraud) limitations period ... appears to apply.
>
> In the case at hand, however, the counterclaims, stripped of allegations of fraud [the fraud counts having been dismissed for failure to state a claim], sound in tort; at most, they claim plaintiff was negligent in his handling of defendant's account.

*Id.* at 1368 (citations omitted). The first paragraph above would apply precisely to those CEA claims which, although not containing fraud as an express ingredient, are bound up in the charge that the acts or omissions by the exchanges that violated the CEA were in bad faith and motivated by self-interest so as to amount to fraud. *See supra* text at notes 19–20. Subsequent cases in this district have embraced the distinction made in *Hornblower. See Panayotopulas v. Chemical Bank*, 464 F.Supp. 199, 204 (S.D.N.Y.1979) (approving *Hornblower* and applying six-year limitations period for fraud to claim for violation of similar regulation); *Loengard v. Santa Fe Industries, Inc.*, 573 F.Supp. 1355, 1357–59 (S.D.N.Y.1983) (applying six-year limitations period for fraud to Martin Act claim).

**24.** The exchanges assert that Illinois is the state where the claim arose and that it is that state's three-year blue sky limitations period, which has been held to apply to CEA claims, *see Grosser,* 639 F.Supp. at 1300–01, that should be compared with the applicable New York statute of limitations under the borrowing statute. They reason that the place where the claim arose cannot be New Mexico, since the federal court in New Mexico held in this case that Michelson's claims did not arise in that state for purposes of determining personal jurisdiction, *see supra* cases cited in text in part III–A, and they cite an unpublished federal district court opinion which holds that for purposes of determining personal jurisdiction a claim arises where the exchange on which plaintiff traded is located, *see Wise v. Commodity Exchange, Inc.*, No. C82–352A, slip op. at 9 (N.D.Ga. Jan. 7, 1983), *reprinted in* Memorandum of Certain Defendants in Support of Their Motions To Dismiss at Exhibit O.

The problem with this analysis is that it confuses the question of where a claim arises for the purpose of determining whether there exists personal jurisdiction—a determination which is concerned only with a defendant's contacts with the forum—with the question of where a cause of action accrues for New York borrowing statute purposes—a determination which is concerned only with the plaintiff's activities.

It is true that the *Grosser* decision considered the statutes of limitations of both the place where plaintiff resided and the place where plaintiff's futures contract was liquidated in performing the borrowing statute comparison. *Grosser,* 639 F.Supp. at 1300–03. However, neither party in *Grosser* argued that one rather than the other jurisdiction was more appropriate, and the survival of the CEA claims did not depend on the difference between the applicable limitations periods in the two states. Moreover, the better approach to the place of injury question in a case like this appears to be to ask "who became poorer, and where did they become poorer" as a result of the conduct complained of. *See Appel v. Kidder, Peabody & Co.,* 628 F.Supp. 153, 156 (S.D.N.Y.1986) (Weinfeld, J.) (finding locus of harm to be state where beneficiaries of allegedly churned trust account resided rather than in state where corpus of trust was located and securities transactions occurred).

the CEA? There appear to be no published decisions which have applied a New Mexico rule of limitation to a CEA claim, and neither the Tenth Circuit Court of Appeals nor the federal district court in New Mexico has definitively answered the question of whether the statute of limitations for common law fraud, N.M.Stat.Ann. § 37–1–4 (1978) (four years), or that for a state securities law violation, N.M.Stat.Ann. § 58–13–42A (1978) (two years),[25] governs a federal securities law violation. *See Jones v. Ford Motor Co.*, 599 F.2d 394, 398 (10th Cir.1979) (declining to decide issue where claim survived under either limitations period); *Stone v. Fossil Oil & Gas*, 657 F.Supp. 1449, 1458 (D.N.M.1987) (same). The Tenth Circuit has stated, however, that it "has applied the longer statute of common law frauds ... rather than the shorter time limit of state securities acts in these types of cases." *Jones*, 599 F.2d at 398 (10b–5 claim); *accord Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1041 (10th Cir.1980) (Colorado); *Clegg v. Conk*, 507 F.2d 1351, 1353 (10th Cir.1974) (Utah), *cert. denied*, 422 U.S. 1007, 95 S.Ct. 2628, 45 L.Ed.2d 669 (1975). Consequently, the most appropriate New Mexico rule of limitation is the four-year period governing common law fraud actions.

■ All that remains is to select the shorter of the applicable New York (six

years) and New Mexico (four years) limitations periods and determine whether Michelson's claims are timely brought.[26] The earliest time when Michelson could have brought his claims was January 10, 1980, when his futures account was liquidated, and he filed the initial complaint in this action in July 1983. Consequently, his CEA claims are timely brought under the shorter, four-year limitations period provided by New Mexico law.[27]

The exchanges' motion to dismiss individual CEA claims will now be considered.

### 1. *CEA §§ 4b & 4c*

The exchanges' motion to dismiss that part of count XI which alleges violations of CEA § 4b, 7 U.S.C. § 6b (1982), against all defendants is granted for the reasons discussed above in part II–D. Likewise, the exchanges' motion to dismiss count XXXIII, which alleges that Merrill Lynch and the exchanges violated section 4c of the CEA, 7 U.S.C. § 6c (1976 & Supp. V 1981), is granted for substantially the reasons stated above in part I–C and because the complaint fails to make direct reference to actions undertaken by the exchanges themselves in violation of the section.

Consequently, count XXXIII and that part of count XI alleging a violation of CEA § 4b are dismissed with prejudice as against the exchanges.

**25.** Interestingly, the statute of limitations for state securities law violations has been lengthened twice since the time relevant to this lawsuit. *See* N.M.Stat.Ann. § 58–13–42 (1984) (effective June 19, 1983) (four years); N.M.Stat. Ann. § 58–13B–41 (1986) (effective July 1, 1986) (five years).

**26.** It could be argued that the rule announced in *Stafford v. International Harvester Co.*, 668 F.2d 142, 150–52 (2d Cir.1981), precludes the application of any New Mexico statute of limitations to Michelson's claims against the exchanges, since such claims could never have been brought in that jurisdiction. *Stafford* held that "[i]nsofar as the purpose of the borrowing statute is ... to prevent a plaintiff from forum shopping, it makes no sense at all to apply the shorter limitation of a state where the defendant could not have been sued." *Id.* at 152 (footnote omitted). In this case, of course, the exchanges were initially dismissed from the action for lack of personal jurisdiction over them in New Mexico.

The effect of *Stafford* here would be simply to dictate application of New York's six-year limi-

tations period to the CEA claims. *See id.* at 154 ("Since there is nothing in this record to show that the action against [defendant] accrued for purposes of New York's borrowing statute anywhere other than New York, the borrowing statute is inapplicable and the action against [defendant] is governed by New York's ... limitations period.").

In fact, as indicated below, Michelson's CEA claims are timely brought under either a four- or six-year statute of limitations, and thus the *Stafford* rule is of no effect here.

**27.** It is therefore unnecessary to consider the effect that either equitable tolling premised on the defendants' fraudulent concealment of their alleged wrongs, *see Korwek v. Hunt*, 646 F.Supp. at 958–59 (holding that tolling did not apply), or class action tolling under the rule of *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), would have on the calculation of the running of various statutes of limitations.

### 2. CEA § 9(b)

Count X alleges that all defendants manipulated or attempted to manipulate the price of silver in violation of CEA § 9(b), 7 U.S.C. § 13(b) (Supp. V 1981),[28] and part of count XI alleges that all defendants acted to create a corner in the silver market or attempted to corner the silver market in violation of the same provision of the law. The exchanges move to dismiss the § 9(b) claims on the ground that this provision of the CEA does not apply to exchanges, citing *Miller v. New York Produce Exchange*, 550 F.2d 762, 768 (2d Cir.), *cert. denied*, 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed. 2d 80 (1977), and *Lagorio v. Board of Trade*, 529 F.2d 1290, 1292 (7th Cir.), *cert. denied*, 426 U.S. 950, 96 S.Ct. 3171, 49 L.Ed.2d 1187 (1976).

■ The exchanges' argument is without merit. In *Miller* the Second Circuit Court of Appeals stated:

> *Although the regulatory provisions of the Act apply to both traders and exchanges,* the ultimate aim and intent of the Act is the elimination of wrongful conduct on the part of the traders. It is they, not the exchanges, who manipulate commodity markets.

550 F.2d at 768 (emphasis added). The occasion for this observation was the court's need to determine whether to permit the trustee of a bankrupt broker who was ruined in a manipulation scheme perpetrated by its customer to recover its losses from the exchange and its directors for not preventing the manipulation. Upholding a directed verdict for defendants by the trial court, the Court of Appeals found not only that there was no evidence of bad faith by defendants, *id.* at 766–67, but that the plaintiff broker could not disassociate itself from its "miscreant" customer's wrongs— rather, on equitable grounds, the plaintiff, as a trader, was in a better position to prevent the wrongdoing than the exchange's directors and could not recover for its customer's wrongs under § 9(b), *id.*

at 768. Nowhere in the decision did the court hold that the § 9(b) claim could not as a general matter be brought against an exchange. To similar effect is the *Lagorio* case, in which the Seventh Circuit Court of Appeals upheld the grant of summary judgment for the defendant exchange on a § 9(b) claim for lack of any allegation or evidence that the directors acted in bad faith. 529 F.2d at 1291–92.

More to the point, however, it would appear to be established that an exchange can be sued for manipulation. *See Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 372 & n. 49, 394 & n. 101, 102 S.Ct. 1825, 1836, n. 49, 1847, n. 101, 72 L.Ed.2d 182 (1982) (where one of underlying cases involved § 9(b) claim against exchange, court held that there is private right of action against exchanges for price manipulation); *Deaktor v. L.D. Schreiber & Co.*, 479 F.2d 529, 530, 534 (7th Cir.) (same), *rev'd on other grounds sub nom. Chicago Mercantile Exchange v. Deaktor*, 414 U.S. 113, 94 S.Ct. 466, 38 L.Ed.2d 344 (1973).

Consequently, the motion by the exchanges to dismiss the CEA § 9(b) claims in counts X and XI is denied.

### 3. CEA §§ 5(d) & 5(g)

Michelson alleges in counts XVII and XVIII that the exchanges failed to maintain an orderly silver market as required by CEA § 5(d), 7 U.S.C. § 7(d) (1982), and § 5a(8), 7 U.S.C. § 7a(8) (1976). Counts XIX and XX charge that the acts of the exchanges were in bad faith and not in the public interest in violation of CEA § 5(g), 7 U.S.C. § 7(g) (1982). The exchanges move to dismiss claims based on sections 5(d) and 5(g) on the ground that there is no private right of action for violations of these provisions of the CEA.

Section 5 of the CEA imposes conditions precedent to the CFTC's designation of a board of trade as a "contract market." Such a designation can only occur when, *inter alia*, the board of trade's governing

---

**28.** Count X in the original complaint also charged all defendants with violations of CEA §§ 6(c) and 13(b), 7 U.S.C. §§ 13b & 13c(b) (1982). These claims were dismissed with prejudice in the 1985 decision for failure to state a private cause of action, *Michelson*, 619 F.Supp. at 739–40, and Michelson has not included them in the amended complaint.

board "provides for the prevention of manipulation of prices and the cornering of any commodity by the dealers or operators upon such board," CEA § 5(d), and the board of trade "demonstrates that transactions for future delivery in the commodity for which designation as a contract market is sought will not be contrary to the public interest," CEA § 5(g). In contrast, section 5a(8) imposes duties on the contract market itself, among them, to

> enforce all bylaws, rules, regulations, and resolutions, made or issued by it or by the governing board thereof or any committee, which relate to terms and conditions in contracts of sale to be executed on or subject to the rules of such contract market or relate to other trading requirements, and which have been approved by the [CFTC] ... and revoke and not enforce any such bylaw, rule, regulation, or resolution, made, issued, or proposed by it or by the governing board thereof or any committee, which has been disapproved by the [CFTC].

Sections 5(d) and 5a(8) were two of the sections at issue in *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 372 n. 49 & 388 n. 87, 102 S.Ct. 1825, 1836 n. 49, 1844 n. 87, 72 L.Ed.2d 182 (1982), in which the Supreme Court held generally that private parties could bring actions for damages caused by violations of the CEA. Section 5(g) was not among the CEA provisions involved in the cases decided by the *Curran* Court.[29]

The *ratio decidendi* of *Curran* was that where courts had implied a private right of action under certain sections of the CEA in the years leading up to Congress' overhaul of the CEA in 1974, the fact that the amendments adopted in that year left untouched the provisions under which courts had been finding a private right of action was evidence that Congress intended to preserve that remedy, even though the statute remained silent as to private judi-

cial remedies. 456 U.S. at 378–88, 102 S.Ct. at 1839–1844. A broad reading of the *Curran* decision would hold that all the CEA sections there referred to as well as any others under which courts implied private rights of action during the period leading up to the 1974 amendments support a private cause of action. Such an approach would uphold private actions based on sections 5(d) and 5a(8), though perhaps not 5(g).

Some strong post-*Curran* guidance on the matter has been provided by the decision of the late Judge Friendly in *Sam Wong & Son v. New York Mercantile Exchange*, 735 F.2d 653 (2d Cir.1984). In *Sam Wong* Judge Friendly held that there is no private right of action under sections 5(a), 5(g) and 5a(10) for failure by an exchange to amend its contract rules. *Id.* at 666–70. In reaching this result, he called attention to the distinction the CEA draws between the requirements for contract market designation in § 5, which is directed to the CFTC, and the operational duties of designated contract markets in § 5a, which is addressed to each exchange. In Judge Friendly's view, the former do not impose duties upon or support private rights of action against exchanges. *Id.* at 667.

The opinion wholly approved Judge Sofaer's rejection of § 5(g) as a basis for suit, *see Jordan v. New York Mercantile Exchange*, 571 F.Supp. 1530, 1554–55 (S.D.N.Y.1983) (public interest standard of § 5(g) is a condition for "contract market" designation which does not create an exchange duty to users of futures contracts), *aff'd in part and rev'd in part sub nom. Sam Wong & Son v. New York Mercantile Exchange*, 735 F.2d 653 (2d Cir.1984), and criticized the view that § 5(d)'s requirement of prevention of manipulation and cornering was equivalent to the broad requirement of maintaining an orderly market. *Sam Wong*, 735 F.2d at 667 & n. 24.

---

**29.** The exchanges' argument that there is no implied right of action under a given section of the CEA unless it was recognized in *Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982), must be rejected. This court has stated in an earlier decision that *Curran* cannot be controlling on the question of whether a particular provision supports a private right of action if that provision was not invoked by the parties or considered by the Court in that case. *See Fustok v. ContiCommodity Services, Inc.*, 618 F.Supp. 1069, 1070 (S.D.N.Y.1985) (17 C.F.R. § 166.3).

But Judge Friendly reserved his strongest criticism for the position taken by the CFTC that *Curran* held that § 5(d) was one of the CEA provisions which had provided and would continue to provide private actions for damages. In this regard, he pointed out that § 5(d) had apparently been a factor in only one of the ten cases the Supreme Court cited in *Curran* for the proposition that there was a line of precedent upholding actions against exchanges. *Id.* at 669 n. 26. With provisions like sections 5(d) and 5(g), Judge Friendly contrasted § 5a(8), which in his view *Curran* had properly endorsed, based on a developed caselaw, as providing a private right of action against an exchange for failing to maintain an orderly market by not enforcing provisions of the CEA, CFTC regulations or contract market rules. *Id.* at 670.

 It is not clear on the present record how close Michelson's claims regarding the exchanges' actions and failures to act come to the issue in the *Sam Wong* case regarding the New York Mercantile Exchange's failure to amend the potato contract in such respects as delivery rules and inspection requirements. *See Jordan,* 571 F.Supp. at 1554. However, even if *Sam Wong* is not controlling in this case, it is still very persuasive authority concerning this circuit's interpretation of *Curran.* On this basis, it would appear that CEA § 5(g), standing alone, cannot support a private right of action. On the other hand, claims premised on CEA § 5a(8), which has a firm place in the pre–1974 caselaw and unequivocal approval in both *Curran* and *Sam Wong* as a source of an implied private right of action, are indeed viable. As to section 5(d), it would seem that its coupling with § 5a(8) in this case eliminates the need to decide whether it can support a private damage action standing alone. Its remaining in the complaint does not contravene the principles discussed above. *See Jordan,* 571 F.Supp. at 1557 ("Where an exchange has failed to control improper trading activities, a violation of the CEA may exist because § 5a(8) requires an exchange to enforce the rules and regulations

against such activities which § 5(d) requires the exchange to promulgate as a condition of designation.").

Accordingly, the exchanges' motion to dismiss the CEA § 5(g) and § 5(d) claims is granted in part and denied in part, and counts XIX and XX are dismissed with prejudice.

### D. *RICO (Counts XII–XIII)* [30]

The exchanges move to dismiss the federal RICO claims asserted against them on the ground that they are barred by the applicable statute of limitations and they do not state a cause of action.

 As explained above in part II–E, Michelson's RICO claims are timely. However, in contrast to the discussion of predicate acts of wire and mail fraud in connection with the motion to dismiss the RICO claims by certain nonexchange defendants, as to the exchanges the complaint does not even give rise to an inference of conduct upon which the RICO claims in either count might be based. Moreover, the failure of the amended complaint to adequately allege a RICO violation against the exchanges appears not the result of inartful or insufficiently particular pleading; rather, it reflects the different role from the other defendants the amended complaint sees the exchanges as having played in the alleged conspiracy. The discussion above in part III–B–1 regarding the Sherman Act claims against the exchanges reflects this as well.

The exchanges' motion to dismiss the RICO claims is therefore granted, and counts XII and XIII are dismissed with prejudice.

### E. *Punitive Damages*

The exchanges move to strike all demands for punitive damages that are predicated on alleged violations of the CEA.

 The contention that punitive damages are not available in an implied private right of action under the CEA has merit. First, it is worth noting by way of analogy that the Court of Appeals for this circuit has ruled that in private fraud actions

**30.** *See supra* text at note 18 for a description of the RICO claims asserted against all defendants.

brought under the federal securities laws only actual damages can be recovered. *See Globus v. Law Research Service*, 418 F.2d 1276, 1283–87 (2d Cir.1969), *cert. denied*, 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970). Second, it is a clue to Congress' intention in this regard that in creating an express private damage remedy for violations of the CEA it has limited liability to actual damages. *See* CEA § 22(a), 7 U.S.C. § 25(a) (1982); *Sam Wong*, 735 F.2d 653, 676 n. 30 (permissible to consider 1982 statute in order to divine Congressional intent as to earlier provisions of CEA, despite nonretroactivity provision of § 22(d), 7 U.S.C. § 25(d)).

Consequently, the exchanges' motion to strike the *ad damnum* paragraphs in the amended complaint which seek punitive damages for violations of the CEA is granted.

## IV. CONHEENEY & WALTUCH

The motions by Conheeney and Waltuch to quash service and dismiss the complaint involve Michelson's chronic difficulty in serving process on several named defendants in this case—a saga which was related in detail in the 1985 decision. *Michelson*, 619 F.Supp. at 741–42. That decision concluded:

> While we are not unmindful of the special difficulties which confront *pro se* litigants, Michelson, like all parties to a litigation, cannot rely upon his *pro se* status as a shield from all mistakes but must at some point bear the consequences of his procedural errors. That point has been reached in this case. Michelson has been afforded numerous opportunities, over a period of more than one year, to correct the deficiencies in his methods of service. The defendants have repeatedly alerted Michelson to the flaws in his service of process and we have undertaken special efforts to assist him. Regrettably, however, Michelson has been unable or unwilling to cure the problems which prevent the attachment of jurisdiction over the moving defendants.....
>
> ....

> For the foregoing reasons, Conheeney's, Conti's and Waltuch's motions to quash service of process are granted, and because jurisdiction has not attached, their motions to dismiss the complaint are also granted.

*Id.* at 742 (citation omitted). Conheeney and Waltuch now move once again in response to Michelson's renewed attempts to serve them with process.

In Conheeney's case, Michelson attempted to effect service by mailing a copy of the amended complaint in November 1985 to William R. Glendon, Conheeney's attorney of record. Affidavit of William R. Glendon, Esq. at ¶¶ 3–4 (Jan. 17, 1986). This mode of service was identical to that which this court had earlier quashed as insufficient on the ground that Conheeney's attorney was not authorized to accept service of process on his client's behalf. *Michelson*, 619 F.Supp. at 742. Conheeney contends that not only should the service of process be quashed and the complaint dismissed once again, but the complaint should be dismissed with prejudice and costs awarded.

In Waltuch's case, Michelson served a summons and amended complaint on him through the court reporter at an April 9, 1986 deposition of Waltuch in two related silver cases. Affidavit of Michael A. O'Connor, Esq. at ¶¶ 2–3 (Apr. 29, 1987); Affidavit of D.J. Michelson at ¶¶ 2–3 (May 13, 1987). Waltuch advances two arguments in support of his motion. First, he contends that since the dismissal of the complaint as to him by the 1985 decision was final and the filing of the amended complaint in November 1985 did not have the effect of commencing a new action against him, there was no action pending against him on April 9, 1986 and the service of the summons and complaint at that time was therefore a nullity. Alternatively, Waltuch contends that even if the filing of the amended complaint on November 4, 1985 did serve to reinstitute the action against him, Michelson's failure to serve him within 120 days of the filing of the complaint and the absence of any showing of good cause for that failure require dis-

missal of the action pursuant to Fed.R.Civ. P. 4(j).

 Both defendants are correct that the most recent attempts to serve them with process are defective and must be quashed. The method of attempted service on Conheeney has already been found to be insufficient, and no new facts have been presented, *see* Glendon Affidavit at ¶ 6, that would alter this conclusion. As to Waltuch, who has resided at the same address in Englewood, N.J. since 1980 and who has been employed at Drexel Burnham Lambert, Inc. in New York City since 1984, *see* O'Connor Affidavit at ¶ 10, this court finds that no good cause has been shown why Michelson could not effect service within 120 days from the filing of the complaint.

Consequently, Conheeney's and Waltuch's motions to quash service are granted, and the complaint is again dismissed as to them with prejudice. It would be inequitable to require Conheeney and Waltuch to commence defending against this suit on the merits, almost four years after its commencement, and it is not unfair to the plaintiff to dismiss with prejudice when he has been given more than one opportunity to accomplish proper service. In any event, it is questionable whether any of Michelson's claims could be brought at this late date within the applicable statutes of limitation.

\* \* \*

In summary, the following aspects of the amended complaint are dismissed as a result of decisions reached on the present motions:[31] Counts I–IV, XIII, and XIX–XX are dismissed with prejudice as to the exchanges; counts V–IX and XVI are dismissed with prejudice as to IMIC and the exchanges; counts V–VI and VIII are dismissed with prejudice as to ACLI, the Hunts, and Placid Oil; counts III, XXI and XIV–XV, to the extent the latter are predicated on extortion or attempted extortion, are dismissed with prejudice as to Merrill Lynch; counts VII, IX, and XVI are dismissed with prejudice as to Merrill Lynch and Prudential-Bache; count XII and that portion of count XI which alleges a violation of CEA § 4b are dismissed with prejudice as to ACLI, the Hunts, Placid Oil, IMIC, Merrill Lynch, Prudential-Bache and the exchanges; count XXXIII is dismissed with prejudice as to Merrill Lynch and the exchanges; the complaint is dismissed as to Conheeney and Waltuch with prejudice; and the demands for punitive damages based on alleged violations of the CEA are stricken as to the exchanges.

It is so ordered.

---

**31.** This resume does not include those claims dismissed by the 1985 decision or those claims which, as indicated at various points in this opinion, are mistakenly described in the amended complaint as alleged against defendants other than those initially charged in the original complaint.